UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

UNION FENOSA GAS, S.A.,

                             Petitioner,                  20 Misc. 188 (PAE)

     -v-

                                                     ORDER

THE DEPOSITORY TRUST COMPANY,

                             Respondent,

     -v-

ARAB REPUBLIC OF EGYPT,

                             Movant.

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

       Petitioner Union Fenosa Gas, S.A. ("UFG") initiated this matter as an *ex parte* petition for judicial assistance pursuant to 28 U.S.C. § 1782. Before the Court is a motion by the Arab Republic of Egypt ("Egypt") to quash two subpoenas—one for documents, the other for deposition testimony—issued by the Court pursuant to that petition. *See* Dkt. 1-2 ("subpoenas"); Dkt. 8 (order granting UFG's § 1782 petition). For the following reasons, the Court (1) sustains, in pruned form to eliminate needlessly burdensome demands, the subpoena for documents, and (2) grants Egypt's motion to quash the subpoena for deposition testimony.

I.    Background

    A.    The Parties

       UFG has obtained a $2 billion arbitral award (the "Award") against Egypt from a tribunal constituted under the Agreement on the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Arab Republic of Egypt (the "Treaty") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States. UFG

states that the Award "relates to Egypt's impairment of UFG's investments in Egypt, which the arbitral tribunal found constituted a breach of the Treaty." Dkt. 2 ("UFG Mem.") at 4. Relevant here, UFG contends that Egypt has "refused to comply with the Award voluntarily." *Id.*

Respondent The Depository Trust Company ("DTC") is the target of the subpoenas that Egypt seeks to quash. In petitioning for the issuance of the subpoenas, UFG alleged that DTC is an agent in the payment chain between Egypt and the holders of notes issued by Egypt under a sovereign bond program (the "Notes").[1] *Id.* at 1–2. UFG hopes "to execute funds belonging to Egypt that will be sued to service and/or redeem" the Notes through a proceeding in the English Courts. *Id.* at 1, 5. UFG's petition to this Court argued that:

> DTC is likely to have critical documents and information pertaining to the servicing and redemption of these various debt instruments, including, *inter alia*, the amounts to be disbursed by Egypt, the sources of such funds, Egypt's ownership and possessory interests in those funds, the manner in which the bonds are serviced and the roles of the various payment agents at each step of the payment process,

*id.* at 2–3, and that this information was the proper object of subpoenas issued pursuant to § 1782. DTC has not entered an appearance in this matter and does not itself seek to quash the subpoenas at this time.

Egypt, the Movant, seeks to quash the subpoenas for reasons discussed in detail below.

**B.      Procedural History**

On April 8, 2020, UFG filed its *ex parte* petition, Dkt. 1; a supporting memorandum of law, UFG Mem.; the declaration of Charlene C. Sun, Esq., Dkt. 3 ("First Sun Decl."), with attached exhibits; the declaration of Sarah Y. Walker, Dkt. 4 ("First Walker Decl."), with

---

[1] UFG identifies three such bond issuances: two listed on the Luxembourg Stock Exchange, and one on the Irish Stock Exchange. UFG Mem. at 1–2.

attached exhibits; the proposed subpoenas, Dkt. 1-2; and a proposed order, Dkt. 1-3. On April 13, 2020, the Court granted UFG's *ex parte* petition. Dkt. 8.

On April 29, 2020, Egypt filed its motion to quash, Dkt. 10; a supporting memorandum of law, Dkt. 11 ("Egypt Mem."); the declaration of Adam Jeremy Silver, Dkt. 12 ("Silver Decl."), with attached exhibits; and a proposed order, Dkt. 13. On May 8, 2020, UFG filed a memorandum of law in opposition, Dkt. 18 ("UFG Opp'n"); the second declaration of Charlene C. Sun, Esq., Dkt. 19 ("Second Sun Decl."), with attached exhibits; and the second declaration of Sarah Y. Walker, Dkt. 20 ("Second Walker Decl."). On May 13, 2020, Egypt filed a reply. Dkt. 21 ("Egypt Reply").

## II.     Discussion

The Court begins by reviewing the legal standards for granting a § 1782 petition. The Court next addresses Egypt's argument that UFG fails to satisfy the statutory requirements of § 1782. The Court then addresses Egypt's argument that the Court should exercise its discretion to quash the subpoenas.

### A.     Applicable Legal Standards

Pursuant to 28 U.S.C. § 1782, a district court may grant a petition for judicial assistance to foreign litigants or tribunals where "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)); *see also* 28 U.S.C. § 1782(a). "The goals of the statute are to provide 'equitable and efficacious' discovery procedures in United States courts 'for the benefit of tribunals and litigants involved in litigation with international aspects,' and to 'encourage

foreign countries by example to provide similar means of assistance to our courts.'" *Brandi-Dohrn*, 673 F.3d at 80 (internal citations and brackets omitted).

Once a court is satisfied that the statutory requirements of § 1782 are satisfied, it "is free to grant discovery in its discretion." *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83–84 (2d Cir. 2004) (citation omitted). "This discretion, however, is not boundless, but must be exercised in light of the twin aims of the statute." *Mees*, 793 F.3d at 297 (internal quotation marks omitted). Additionally, in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), "the Supreme Court identified four additional 'factors [(the "*Intel* factors")] that bear consideration in ruling on a § 1782(a) request.'" *Mees*, 793 F.3d at 298 (quoting *Intel*, 542 U.S. at 264). These are:

> (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," in which case "the need for § 1782(a) aid generally is not as apparent"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome."

*Id.* (quoting *Intel*, 542 U.S. at 264–65).

**B.     Analysis**

Egypt argues that the subpoenas should be quashed because they fail the statutory requirement that the discovery be "for use" in a foreign proceeding. Egypt argues that this is so for two reasons: first, because the foreign proceeding is not adjudicative in nature, Egypt Mem. at 5–8, and second, because the proceeding is not within reasonable contemplation, *id.* at 8–10. Egypt separately argues that the subpoenas fail two of the four *Intel* factors. *Id.* at 10–15. The Court begins by reviewing the law governing, and the parties' arguments as to whether, the subpoenas satisfy § 1782's statutory "for use" requirement.

### 1. The "For Use" Requirement

#### a. Adjudicative in nature

In *In re Letters Rogatory Issued by Director. of Inspection of Government of India*, 385 F.2d 1017, 1020–21 (2d Cir. 1967) ("*India*"), Judge Friendly, writing for a unanimous panel of the Second Circuit, interpreted § 1782's requirement that the discovery be "for use" before a foreign "tribunal," to require that the proceeding in question be adjudicative in nature. *Id.* at 1020–21. While making clear that this requirement was not to be so narrowly construed as to defeat the goals of the statute, the *India* court held that the "concept is not so broad as to include all the plethora of administrators whose decisions affect private parties and who are not entitled to act arbitrarily." *Id.* at 1021.

In *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24 (2d Cir. 1998), the Second Circuit relied on *India* and its progeny to affirm the denial of a § 1782 motion. There, petitioners sought discovery for use in a French bankruptcy proceeding. The Circuit held that on the facts of that case, the bankruptcy proceeding was "not an adjudicative proceeding within the meaning of [§ 1782]" because "[t]he merits of the dispute between [the parties had] already been adjudicated and [would] not be considered" anew. *Id.* at 28. Because "nothing is being adjudicated [and] the already extant judgment is merely being enforced," the Circuit held that the district court had correctly found the discovery was not "for use in a proceeding before a foreign tribunal." *Id.*; § 1782.

Since *Euromepa*, the Second Circuit "has addressed the 'for use' requirement on several occasions." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017) ("*Accent Delight*") (citing *Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, LLP*, 798 F.3d 113, 122–24 (2d Cir. 2015) ("*KPMG*"); *Mees*, 793 F.3d at 298–301; *Brandi-Dohrn*, 673 F.3d at 81–84). "Although [it] ha[s] approached the issue according to the particular facts of each case and the

5

arguments presented, [the Circuit has] focused in each on the practical ability of an applicant to place a beneficial document—or the information it contains—before a foreign tribunal." *Id.* After canvassing these decisions, the Second Circuit in *Accent Delight* concluded that "the following principles emerge":

> First, a Section 1782 applicant must establish that he or she has the practical ability to inject the requested information into a foreign proceeding. Second, as long as he or she makes that showing, it is not fatal to the application that he or she lacks a claim for relief before the foreign tribunal, whether for damages or otherwise. Rather, the term 'for use' in Section 1782 has only its ordinary meaning—that the requested discovery is something that will be employed with some advantage or serve some use in the proceeding.

*Accent Delight*, 869 F.3d at 132 (internal citations and quotation marks omitted).

Egypt, relying heavily on *Euromepa*, argues that the subpoenas fail § 1782 because UFG seeks discovery in support of an attempt to enforce an arbitration award that, in UFG's words, was "register[ed]" by an English Court, "giving it the force of an English court judgment." UFG Mem. at 4. Because UFG seeks only "to execute funds belonging to Egypt" in order "to enforce an arbitral award," *id.* at 1, Egypt argues, there remains nothing to be adjudicated and the "for use" requirement is not satisfied under *Euromepa*. Egypt Mem. at 5–8; Egypt Reply at 2–5.

UFG's original motion argued that "the English Court's determination concerning whether particular assets are subject to attachment and execution under English law is adjudicative in nature" because it "will be required to make factual findings concerning the possessory and ownership interests in the funds and apply English law to determine whether those interests leave the funds susceptible to execution." UFG Mem. at 8. UFG therefore asserted that "there is no question that UFG would be able to 'inject' the information it obtains from DTC into the English Proceedings, where it will have to prove, *inter alia*, Egypt's ownership and possessory interests in the funds used to make payments on the Notes, as well as the commercial nature of those funds." *Id.* In its opposition to Egypt's motion to quash, UFG

6

supplements this argument by contending that, under the relevant case law, it needs merely to show that the sought-after documents "will be employed with some advantage or serve some use in the [foreign] proceeding," UFG Opp'n at 5 (quoting *Mees*, 793 F.3d at 298), and that it has met this burden by showing that the discovery would allow it to establish certain factual prerequisites in the English attachment proceeding.

UFG further argues that Egypt improperly reads *Euromepa* as introducing a categorical prohibition on using § 1782 in service of foreign attachment proceedings. *Id.* at 6–8. UFG cites *In re Gorsoan*, a recent decision from this District, as "the most appropriate analytical framework for this case." *Id.* at 8 (citing *In re Gorsoan Ltd.*, No. 18 Misc. 431 (RA), 2020 WL 409729 (S.D.N.Y. Jan. 24, 2020)). *Gorsoan* is not dispositive, however. As relevant here, it simply recognizes, consistent with the Second Circuit precedent surveyed above, that neither *Euromepa* nor the later district court cases cited by the parties in that proceeding "established a broad rule that asset discovery can never be adjudicative and is thus always impermissible under § 1782. Instead, each case cited by Respondents . . . denied the requested discovery because it would have had no effect on the resolution of the merits in the foreign tribunal." *In re Gorsoan Ltd.*, 2020 WL 409729, at *4.

The Court is therefore left to determine, with close attention to the foreign proceedings at issue here, whether UFG has met its burden of showing that the discovery it seeks from DTC "will be employed with some advantage or serve some use in the proceeding." *Accent Delight*, 869 F.3d at 132 (citation omitted). Although this analysis turns on "the particular facts of [this] case," *id.* at 131, "the Second Circuit has warned that district courts should avoid inquiring into foreign evidentiary rules so as to keep the assessment of § 1782 applications from becoming a battle-by-affidavit of international legal experts." *In re Noguer*, No. 18 Misc. 498 (JMF),

7

2019 WL 1034190, at *2 (S.D.N.Y. Mar. 5, 2019) (quoting *KPMG*, 798 F.3d at 122 n.11) (internal quotation marks omitted). Ultimately, "so long as a [§] 1782 applicant has establish[ed] that it will have some means of actually using the evidence in the foreign proceeding, in the absence of authoritative proof that a foreign tribunal would reject the evidence obtained, a district court should not reject a Section 1782 application" for failure to satisfy the "for use" ground. *Id.* (internal quotation marks and citations omitted).

UFG's original motion was supported by the Declaration of Sarah Walker, a lawyer qualified to practice in England and Wales. First Walker Decl. ¶ 1. Walker avers that "[u]nder English law, a judgment creditor of a foreign state may execute upon any property owned by the foreign state that is in use or intended for use for 'commercial purposes.'" *Id.* ¶ 8. Walker further states that:

> In order to determine whether the Egyptian funds are susceptible to attachment and execution in aid of the English Recognition Order, the English Court will be asked to consider and adjudicate questions pertaining to Egypt's ownership and possessory interests in those funds and apply English law to determine whether those interests leave the funds susceptible to execution . . . . [T]he discovery sought from DTC will provide centrally relevant evidence that will assist both UFG, in carrying its burden, and the English Court in adjudicating the issues of fact and law that will be presented by the enforcement motions.

*Id.* ¶ 11.

In response, Egypt submitted the Declaration of Adam Silver, also an English law qualified lawyer. Silver Decl. ¶ 2. Silver avers that "[a] party to litigation who obtains a money judgment in its favor that is enforceable in England (a 'judgment creditor') is able to pursue a number of potential enforcement remedies against the judgment debtor's assets in the jurisdiction. One commonly used enforcement remedy is known as a third party debt order ('TPDO')." *Id.* ¶ 5. Silver then explains that, when a party pursues a TPDO, "such applications are often made ex parte" on a standardized form. *Id.* ¶ 8. Silver concedes, however, that

8

"English Courts will not grant speculative applications for TPDOs" and "will only make an interim [TPDO] against a bank or building society if the judgment creditor's application notice contains evidence to substantiate his belief that the judgment debtor has an account with the bank or building society in question." *Id.* ¶ 9. "After obtaining an interim TPDO from the Court, the judgment creditor must serve it on the bank or other third party and on the judgment debtor, together with copies of its application and all documents filed with the Court in support of its application." *Id.* ¶ 11. Before a final TPDO is issued, Silver states, there is usually a hearing with both parties at which "the Court will hear argument from the parties and render its decision or, if necessary[,] direct that there be a trial of the relevant issues." *Id.* ¶ 13.

Contrary to the assertion made by Egypt in its brief, the Silver Declaration does not support a finding that an attachment proceeding in English court merely "requires the creditor to identify the financial institution and (if applicable) account number for the funds being attached [but] does not require any other affirmative showing," Egypt Mem. at 9. And UFG notes that an *ex parte* proceeding in English court also requires the moving party "to raise and address any arguments that Egypt would—if it were present—make against the issu[ance] of a TPDO, including whether the targeted assets are executable under English law." Second Walker Decl. ¶ 6. This anticipatory dimension of UFG's filing, too, has an adjudicative quality.

Although the Silver Declaration focuses on the process for obtaining a TPDO, which it attempts to paint as perfunctory, this too does not carry the day for Egypt. The Silver Declaration acknowledges that a TPDO is but one of "a number of potential enforcement remedies against the judgment debtor's assets[.]" Silver Decl. ¶ 5. And Egypt does not assert that *none* of the potential enforcement remedies available to UFG involve factfinding or adjudication by the English tribunal, such that the discovery it seeks from DTC could never "be

9

employed with some advantage or serve some use in the proceeding." *Accent Delight*, 869 F.3d at 132 (citation omitted). The Court, therefore, while regarding the question as relatively close, concludes that UFG has met its burden of showing that the English proceeding is adjudicative in nature. *See id.*; *In re Noguer*, 2019 WL 1034190, at *2.

### b. Actually pending

The Court next considers the second aspect of the "for use" requirement—whether there is or will soon be a foreign proceeding. *Euromepa*, 154 F.3d at 27. The Second Circuit first addressed this requirement in *In re International Judicial Assistance (Letter Rogatory) for the Federative Republic of Brazil*, 936 F.2d 702 (2d Cir. 1991) ("*Brazil*"), and "held that a proceeding need not actually be pending, but rather that a proceeding must be 'imminent—very likely to occur and very soon to occur,'" *id.* at 28 (quoting *Brazil*, 936 F.2d at 706). The Supreme Court subsequently "reject[ed] the view . . . that § 1782 comes into play only when adjudicative proceedings are 'pending' or 'imminent'" and instead "[held] that § 1782(a) requires only that a dispositive ruling by [a foreign tribunal] . . . be within reasonable contemplation." *Intel*, 542 U.S. at 259. The Second Circuit has interpreted this holding to mean that "the proceedings cannot be merely speculative. At a minimum, a § 1782 applicant must present to the district court some concrete basis from which it can determine that the contemplated proceeding is more than just a twinkle in counsel's eye." *KPMG*, 798 F.3d at 124.

Egypt argues that the attachment proceedings at issue here are merely speculative because UFG currently lacks the requisite information—the bank account numbers, or even the names of the banks where the funds it seeks to attach are located—to commence such a proceeding. *See* Egypt Mem. at 9 (citing Silver Decl. ¶¶ 8–9). Thus, Egypt argues, UFG's motion is a mere fishing expedition and should be denied pursuant to *Intel* and *KPMG*. *Id.* at 9–10.

UFG responds that "[f]ar from hypothetical, the foreign proceeding in aid of which this discovery will be used is currently pending, and UFG is at present entitled to seek attachment of Egypt's assets within that proceeding." UFG Opp'n at 11 (internal quotation marks omitted) (citing Second Walker Decl. ¶ 5). UFG points out that "it is fully permissible for Section 1782 discovery to be used where the evidence obtained may be used at some stage of the foreign proceeding." *Id.* at 12 (citing *Mees*, 793 F.3d at 301). And it argues that the information it has already obtained regarding the sovereign debt bond offerings in question makes its efforts to obtain documents from DTC targeted enough to be distinguishable from a mere fishing expedition for assets in this jurisdiction. *Id.* at 12–14.

While this issue too is fairly argued each way, the Court concludes that UFG has met its burden of establishing that the English proceeding is within reasonable contemplation. The proceeding in which UFG intends to move to attach funds is ongoing, and UFG has shown that the discovery it seeks will "be used at some stage" of that proceeding. *See Mees*, 793 F.3d at 301. UFG has therefore satisfied this statutory requirement of § 1782.

    **2.**    *Intel* **Factors**

Egypt argues that, even if the subpoenas are found to satisfy the statutory factors, the Court, in its discretion, should quash them because they fail the first and fourth *Intel* factors. The Court considers these arguments in turn.

    *a.*    *First* Intel *factor*

The first *Intel* factor instructs the Court to consider whether "the person from whom discovery is sought is a participant in the foreign proceeding." *Intel*, 542 U.S. at 264. If so, "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* "In contrast,

11

nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Id.*

UFG states that DTC is a non-party to the English proceeding, UFG Mem. at 10–11, but Egypt counters that this "elevates form over substance because the evidence sought in the subpoena all relates to notes issued by Egypt, agency agreements executed by Egypt, and the identification of funds owned by Egypt," Egypt Mem. at 11. Egypt thus argues that it is the real party in interest in this § 1782 proceeding, and that the Court should therefore quash the subpoenas. *Id.* at 11–12 (citing *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 852, 202 L. Ed. 2d 582 (2019); *Schmitz*, 376 F.3d at 85).

UFG responds that Egypt improperly construes the first *Intel* factor as asking whether UFG could obtain the information some other way, *e.g.*, from Egypt directly in the English proceeding. UFG Opp'n at 15–17. UFG cites to a recent case in this District, *Top Matrix Holdings Ltd.*, which found a similar argument "inconsistent with the [plain] language of the first *Intel* factor and its application." *Id.* at 15−16 (citing *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020)). UFG also contends that Egypt's argument "necessarily rests on the assumption that there would be near or complete overlap between the documents in DTC's possession and those in Egypt's possession," noting that "it is likely that DTC will have correspondence in its possession concerning the mechanics of bond payments and otherwise regarding its role as clearing agent that Egypt was not copied on and does not have." *Id.* at 17. Finally, UFG seeks to distinguish the *Kiobel* line of cases cited by Egypt on the basis that they involved discovery directed at law firms, and reflect the Circuit's

concern that American attorneys would be compelled "to deliver documents that would not be discoverable abroad, and that are in counsel's hands solely because they were sent to the United States for the purpose of American litigation." *Kiobel*, 895 F.3d at 241; *see* UFG Mem. at 16–17.

In its reply, Egypt contends that while DTC may have documents that are not in Egypt's possession, such documents are irrelevant to the English attachment proceeding and therefore fail the statutory "for use" requirement. Egypt Reply at 6. Any information that is properly within the scope of the English proceeding, Egypt contends, is in Egypt's possession and can and should be obtained through the English proceeding. *Id.*

The Court is mindful that "[t]he *Intel* factors are not to be applied mechanically." *Kiobel*, 895 F.3d at 245. Thus, the fact that UFG seeks discovery from DTC and not from Egypt is not dispositive. As Egypt's arguments make clear, resolving this factor requires an assessment of the scope of the subpoenas, which Egypt separately contends are overbroad. The extent to which the subpoenas are appropriate in scope but nevertheless seek information that UFG cannot obtain through the English proceeding is highly relevant to the first *Intel* factor. The Court therefore turns to this question and Egypt's arguments under the fourth *Intel* factor.

### b. Fourth Intel *factor*

The fourth *Intel* factor instructs the Court to be alert for "unduly intrusive or burdensome requests," which may be rejected or trimmed. *Intel*, 542 U.S. at 265. The Second Circuit has instructed district courts to "assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302. Importantly,

> it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright. Thus, to the extent a district court finds that a discovery request is overbroad, before

> denying the application it should ordinarily consider whether that defect could be cured through a limited grant of discovery.

*Id.* (internal quotation marks, citations, and footnote omitted).

Egypt argues that the subpoenas are overbroad because rather than being "limited to the immediate governing agreements and documents concerning the Notes," the subpoenas seek "'any and all documents or communications' that evidence or concern 'any [a]ccounts held in [f]inancial [i]nstitutions(s) in England in connection with the Notes,' including information pertaining to 'Egypt's ownership interests in any [a]ccounts,' as well as '[a]ny and all of Egypt's property that is held in escrow or trust in connection with the Notes.'" Egypt Mem. at 13 (internal citations omitted). Egypt contends that "UFG is seeking discovery of accounts Egypt may use to fund the Notes, an ancillary and overbroad request." *Id.* Egypt further objects to the subpoenas' request for "'[a]ny and all documents or communications evidencing or concerning wire transfers, or transfers of capital, made by Egypt, or any representative or agent for Egypt' in connection with the Notes that are 'located anywhere in the world[,]'" which it characterizes as a "sweeping request[]" revealing UFG's true aim of a fishing expedition for assets that could be seized in "other hypothetical proceedings that might be brought elsewhere around the world." *Id.* (internal citations omitted). Finally, Egypt objects that the subpoenas are overbroad not only in seeking "any and all" documents or communications, but also by defining communications to include "any transmittal of information in the form of facts, ideas, inquiries, or otherwise, located anywhere in the world." *Id.* at 14 (internal citations omitted).

Egypt therefore asks the Court, as an alternative to quashing the subpoenas outright, to prune them, to wit, to (1) "limit any discovery to materials that are geographically within the United States"; (2) limit the subpoena "solely to documents involving the Notes," and strike "the requests concerning accounts and transactions (e.g., 'wire transfers' and 'transfers of capital')";

and (3) quash in its entirety the subpoena seeking testimony, "as Petitioner has made no showing as to the relevance of live witness testimony, instead focusing on specific documents relating to the Notes." *Id.* at 15 (internal citations omitted).

UFG counters by emphasizing the undisputed relevance of parts of the discovery it seeks, and arguing that "Egypt does not contest the relevance of UFG's requested discovery." UFG Opp'n at 18. It also faults Egypt for, in its view, claiming but not demonstrating that the subpoenas pose an undue burden for DTC. *Id.* UFG further argues that Egypt, as an intervenor, "lacks standing to attack [a] subpoena on grounds of 'burden,' for the obvious reason that the subpoena cannot impose any burden on a party who is not required to respond to it." *Id.* Finally, UFG argues that recent Second Circuit authority permits § 1782 to be directed extraterritorially. *Id.* at 19 (citing *In re del Valle Ruiz*, 939 F.3d 520 (2d Cir. 2019)).

Beginning with UFG's final argument, while it is correct that the Second Circuit has recently held that "a district court is not categorically barred from allowing discovery under § 1782 of evidence located abroad," the Circuit stated, in the very next sentence, that "a court may properly, and in fact should, consider the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery." *In re del Valle Ruiz*, 939 F.3d at 533. The Court must therefore still consider the appropriateness of the subpoena's request for documents outside the United States—an argument UFG does not directly address on the merits.

As for UFG's standing argument, the Court agrees with Egypt "that parties against whom the requested information will be used may have standing to challenge the lawfulness of discovery orders directed to third parties." *Application of Sarrio, S.A.*, 119 F.3d 143, 148 (2d Cir. 1997) (citing *India*, 385 F.2d at 1017). Here, where Egypt challenges the breadth of the

sought-after discovery, as opposed to the burden it will impose on DTC, the Court finds that the challenge is properly brought.  And despite UFG's protestations that Egypt has not challenged the relevance of the discovery it seeks from DTC, Egypt has clearly done so with respect to aspects of the subpoenas—the requests that go beyond "documents involving the Notes."  Egypt Mem. at 15; Egypt Reply at 6 ("Notwithstanding UFG's assertion that all it needs to pursue the Potential Attachment is 'the agreements governing the handling and respective legal interests' in funds used to pay the Notes, the [s]ubpoena seeks a far broader range of documents." (internal citation omitted) (quoting UFG Opp'n at 12)).

Having carefully considered the arguments of both UFG and Egypt, the Court concludes that a degree of tailoring is appropriate to address Egypt's valid concerns of overbreadth.  *See Mees*, 793 F.3d at 302.  The Court therefore narrows UFG's document requests as follows.  First, the documents produced by DTC shall be limited to "the agreements governing the handling and respective legal interests in" the funds "used by the paying agent to make debt service payments on the bonds"; documents showing "which of those financial institutions [acting as paying agents] is in possession of the funds at any particular juncture"; documents that will allow UFG to "explain [to the English court] how the agreements underlying the bonds treat questions of ownership and control of those funds at each step in the payment process"; and any other documents relating directly to the Notes, including documents providing identifying information about them.  *See* UFG Opp'n at 12–13.  For documents fitting any of these criteria, the Court declines Egypt's request to limit discovery to materials that are within the United States.  *See In re del Valle Ruiz*, 939 F.3d at 533.

Finally, the Court quashes UFG's subpoena for live testimony.  Egypt specifically objected to this subpoena in its motion to quash, Egypt Mem. at 15, and UFG did not respond in

any way in its opposition, *see* UFG Opp'n. That subpoena is, on the present record, clearly unnecessary.

The Court finds that, tailored in this manner, UFG's subpoena comports with both the first and fourth *Intel* factors.

## CONCLUSION

For the reasons stated in the foregoing, the Court grants Egypt's motion in part and therefore modifies UFG's subpoenas as specified in this order. The Clerk of Court is respectfully directed to terminate the motion pending at docket 10 and to close this matter.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: May 29, 2020
       New York, New York